**Dederick KELLY, Plaintiff,**

v.

**BANK MIDWEST, N.A., Defendant.**

No. 00–2042–JWL.

United States District Court,
D. Kansas.

July 27, 2001.

**1250**

John W. Kurtz, Hubbard & Kurtz, L.L.P., Kansas City, MO, for plaintiff.

Daniel D. Crabtree, Stinson, Mag & Fizzell, P.C., Leawood, KS, Brian R. Markley, Stinson, Mag & Fizzell, P.C. Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff filed suit against defendant alleging false arrest, negligent and intentional infliction of emotional distress, and race discrimination arising out of plaintiff's visits to defendant's branch in Kansas City, Kansas for purposes of obtaining a loan. This matter is presently before the court on defendant's motion for summary judgment (doc. # 35) with respect to plaintiff's claim of race discrimination pursuant to 42 U.S.C. § 1981. As set forth in more detail below, defendant's motion with respect to this claim is denied. Moreover, while the court previously granted defendant's motion with respect to plaintiff's state law claims during a telephone conference, the court elaborates on its rulings with respect to those claims below.

### I. Procedural History

On January 5, 2001, the court held a telephone conference during which it granted defendant's motion for summary judgment with respect to plaintiff's claims of false arrest and negligent and intentional infliction of emotional distress. The court retained under advisement defendant's motion with respect to plaintiff's section 1981 claim pending the appeal of *Hampton v. Dillard Dep't Stores, Inc.*, 985 F.Supp. 1055 (D.Kan.1997) and 18 F.Supp.2d 1256 (D.Kan.1998), a case which concerned, in part, the proper scope of section 1981. The Tenth Circuit has now issued its order, *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091 (10th Cir.2001), and the court is prepared to rule on defendant's motion with respect to plaintiff's section 1981 claim. Moreover, because the court granted summary judgment on plaintiff's state law claims during a telephone conference, the court, for the benefit of the parties, will use this opportunity to explain

in more detail its analysis concerning plaintiff's state law claims.

## II. Facts

The following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party. Defendant Bank Midwest is a bank which operates branches in northern Missouri and eastern Kansas. One of defendant's branches is located at 78th Street and State Avenue in Kansas City, Kansas. Plaintiff Dederick Kelly, an African American male, visited this location on three consecutive days in February 1999. His claims in this suit arise out of certain events occurring at the bank over this three-day period in connection with plaintiff's efforts to obtain a loan.

*February 17, 1999*

On February 17, 1999, plaintiff and his brother, Willie Kelly,[1] went to defendant for the purpose of securing a loan. Specifically, both plaintiff and his brother intended to purchase a certificate of deposit (CD) for $1000 and, at the same time, borrow $1000 using the CD as collateral. According to plaintiff, the purpose of this transaction was to allow plaintiff and his brother to reestablish their credit. To purchase the CD, plaintiff and his brother each presented a document entitled "Official Check." The checks reflected that they were issued by Mercantile Bank on the previous day, February 16, 1999. One of the two checks was purchased by plaintiff and made payable to his brother. The other check was purchased by Willie Kelly and made payable to plaintiff.

Upon entering the bank, plaintiff and/or his brother advised the receptionist of the type of transaction they wanted to complete. The receptionist advised them that they would be helped by the next available person. After waiting for approximately 15 or 20 minutes, one of defendant's customer service representatives, Kellie Hunt, approached the brothers and stated that she could help either of them. Willie Kelly then followed Ms. Hunt to her desk. Approximately 5 to 10 minutes later, plaintiff was assisted by Cathy Turner, the supervisor of the customer service representatives.

Before turning to plaintiff's encounter with Ms. Turner, it is helpful to review the circumstances surrounding Willie Kelly's encounter with Ms. Hunt. As per her standard procedure, Ms. Hunt initially copied Willie Kelly's driver's license and contacted Chex Systems to inquire whether Willie Kelly had had any closed accounts due to insufficient funds. She discovered that Willie Kelly had bounced at least one check drawn on an Oklahoma bank. Under defendant's policy, this prevented Ms. Hunt from opening an account for Willie Kelly and this was apparently communicated to Willie Kelly. Ms. Hunt then contacted defendant's fraud and forgery officer, Bill Hall, because she was apparently "concerned" about Willie Kelly, primarily because he presented an Oklahoma driver's license with a Kansas City, Missouri address and because Ms. Hunt did not believe that Willie Kelly looked like the picture on the driver's license. Mr. Hall proceeded to run a criminal background check on Willie Kelly.[2] The check revealed two

---

1. To avoid confusion, the court will refer to Dederick Kelly as "plaintiff" and will refer to plaintiff's brother using his full name, Willie Kelly.

2. It is unclear why Ms. Hunt wanted to "follow up" on her concerns about Willie Kelly

when she knew that the bank could not open an account for him in any event. It is also unclear whether it was the bank's standard procedure to run criminal background checks on individuals who presented driver's licenses that were questioned by the bank for whatever reason.

outstanding warrants for Willie Kelly's arrest. One of the warrants was followed by an asterisk. Mr. Hall had apparently never seen an asterisk following a warrant during any of the checks he had performed. Mr. Hall told Ms. Hunt about the warrants, their nature and his "concern" about the asterisk. Mr. Hall then asked Ms. Hunt to notify the bank's security guard about "what was going on." He also asked her to send him copies of any identification information and copies of the Official Checks. After receiving a copy of the checks, Mr. Hall called the security fraud department at Mercantile Bank to ask whether Mercantile issued an instrument called an "Official Check." At the request of Mercantile, he faxed to Mercantile a copy of the two checks. After reviewing the fax, Mercantile agents believed that the Official Checks were in fact issued by Mercantile. Mr. Hall then asked Mercantile to verify that the Official Checks were not stolen. Mercantile indicated that it would contact the customer (presumably one or both of the Kelly brothers) to find out the answer and would report back to Mr. Hall.

In the meantime, before contacting the security guard, Ms. Hunt telephoned Ms. Turner, who was assisting plaintiff with his loan application. Ms. Hunt told Ms. Turner about everything that she had learned up to that point. At some point during the phone call, Ms. Turner told Ms. Hunt that plaintiff was seeking the same transaction as Willie Kelly. Despite some apparent concerns with plaintiff's transaction (namely, the fact that each of the Kelly brothers had purchased one check made payable to the other and that plaintiff did not look like his driver's license picture), Ms. Turner helped plaintiff complete a loan application. She also photocopied his driver's license and the Official Check. Ms. Turner then advised plaintiff that the bank would contact him the next day regarding the status of his application. At that point, Ms. Turner gave plaintiff's application materials to Ms. Hunt for further processing.

In the meantime, Ms. Hunt "explained everything" to the bank's security guard on duty, Victor Grabbe. Mr. Grabbe, for whatever reason, also looked at the pictures on both plaintiff's and Willie Kelly's driver's licenses. He determined that the Kelly brothers did not look like the pictures on their respective licenses. Mr. Grabbe was also concerned that the requested transaction resembled a form of fraud called a "split deposit"—when a individual deposits a check and withdraws some portion of the deposit in cash before it is discovered that the deposited check is worthless for some reason. Mr. Grabbe contacted his supervisor and explained his concerns. He also expressed concern to his supervisor that the brothers were in separate areas of the bank and that each of the brothers was "larger" than Mr. Grabbe. Mr. Grabbe's supervisor advised Mr. Grabbe that he "might want to call the police for assistance as there were two of them." Mr. Grabbe called the police to request assistance. No police officer ever responded or appeared at the bank on that day and the Kelly brothers left the bank without incident. After the Kelly brothers left the bank, Mr. Grabbe wrote a Branch Activity Report and Memorandum—a form that security guards regularly complete about events that happen at the branch while they are on duty.

*February 18, 1999*

On the morning of February 18, 1999, plaintiff called Ms. Turner to inquire about the status of his loan. Ms. Turner apparently indicated that the bank would be unable to process his loan because some of the information he presented to the bank made the bank personnel "uncomfortable." When pressed for details, Ms. Turner told plaintiff that one of the loan officers had

driven by a property that plaintiff had identified on his loan application and that the officer had reported that the property was a vacant lot. Plaintiff informed Ms. Turner that his property was not a vacant lot. She also mentioned that plaintiff's social security number did not match his driver's license number. Plaintiff advised Ms. Turner that he purposefully used a different number on his driver's license for security and privacy reasons. Plaintiff then asked to speak to whomever was in charge at the branch. He was put in touch with Bart Nill, the branch manager. Mr. Nill apparently reiterated Ms. Turner's concerns. Plaintiff advised Mr. Nill that he would bring to the bank additional documentation to verify the information in his loan application. Plaintiff gathered additional materials, including real property appraisals, and returned to the bank.

During this same time frame, a representative from Mercantile contacted Mr. Hall and allegedly stated that she had spoken to the customer (there is no evidence concerning whether she spoke to one of the brothers or both) and that the customer did not know where the checks were and they must be lost or stolen. She also stated that the customer did not remember being in Bank Midwest. Plaintiff vigorously denies that the checks were reported lost or stolen. Also during this time frame, Mike Murchison, the security guard on duty that day, read the Branch Activity Report and Memorandum written the previous day by Mr. Grabbe. From this Report, Mr. Murchison learned about

Willie Kelly's outstanding warrants. At some point thereafter, he heard that one of the checks brought by the Kelly brothers had been reported as stolen.

The Kelly brothers returned to the bank shortly before noon on February 18, 1999.[3] The receptionist advised the brothers that neither Mr. Nill nor Ms. Turner were present at that time. In the meantime, having seen the Kelly brothers in the bank, Mr. Murchison, based on what he knew,[4] told the head teller, Sharla Cain, to call the police. Two officers were dispatched to the bank. The dispatcher told the officers only that there were suspicious parties in the parking lot at the bank and gave the officers a description of the vehicle. As the Kellys were attempting to leave the bank's parking lot, their car was blocked by the police cars of the two officers. At that time, the officers had only the information that the dispatcher had provided to them.

The officers asked the Kelly brothers for identification and questioned the brothers about why they were at the bank. After questioning the brothers, one of the officers went into the bank. The other officer stayed with the Kelly brothers in the parking lot. When the officer returned from inside the bank, he essentially told the brothers that everything was fine. All told, plaintiff was detained for 20 to 30 minutes. Plaintiff then went back into the bank in an effort to ascertain why the police had been called. One of the officers accompanied him. Receiving no answer

---

**3.** While it is unclear from the record, Willie Kelly apparently was returning to the bank to attempt the same transaction. He had contacted the Oklahoma Bank, had "cleared up" the situation concerning the bounced check, and wanted defendant to reconsider his application.

**4.** It is unclear whether Mr. Murchison had heard about the checks being reported as

stolen prior to telling Ms. Cain to call the police. After the police had been called and had arrived at the bank, however, defendant learned that, according to Mercantile, the customer had "changed his mind" and that the checks were in fact not lost or stolen. Again, plaintiff disputes that the checks were ever reported lost or stolen.

from anyone, plaintiff made an appointment to meet with Mr. Nill the following day. The Kelly brothers then left the bank and, a few minutes later, the officers left as well.

*February 19, 1999*

On February 19, 1999, plaintiff returned to the bank. His brother did not join him on this visit. Mr. Nill apologized to plaintiff and conceded that the bank had handled the situation poorly. According to plaintiff, he asked whether it was the bank's common practice to drive by property listed on a loan application, to call the police, or to contact another bank's fraud department to determine whether checks had been stolen. Mr. Nill responded that it was not the bank's common practice to do such things. Plaintiff asked Mr. Nill whether "all this" would have happened if he were white. According to plaintiff, Mr. Nill responded, "probably not." Mr. Nill denies giving this response. In any event, at the end of plaintiff's meeting with Mr. Nill, he learned that the bank had decided to give him the loan he had requested. Plaintiff then completed the closing documents for the loan, obtained the loan proceeds and left the bank.

## III. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every ac-

tion." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## IV. Plaintiff's Section 1981 Claim

■ According to plaintiff, defendant's conduct with respect to plaintiff's loan application violates 42 U.S.C. § 1981. Defendant contends that summary judgment is warranted on plaintiff's section 1981 claim because plaintiff cannot demonstrate a prima facie case of discrimination. Specifically, defendant argues that plaintiff's claim must fail because he cannot show the actual loss of a contract interest in that the bank gave him the loan that he requested. As explained more fully below, the mere fact that plaintiff obtained the loan from defendant is insufficient to preclude plaintiff's section 1981 claim. Thus, defendant's motion is denied.[5]

■ Section 1981 addresses racial discrimination in contractual relationships. As amended by the Civil Rights Act of 1991, the statute reads as follows:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kinds, and to no other.

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and

the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981(a)-(c). To establish a prima facie case of discrimination under section 1981, plaintiff must show that he is a member of a protected class; that defendant had the intent to discriminate on the basis of race; and that the discrimination interfered with a protected activity as defined in section 1981. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir.2001). Plaintiff alleges that defendant interfered with his right to make and enforce contracts.

■ According to defendant, a section 1981 claim for interference with the right to make and enforce a contract must involve the actual loss of a contract interest. In support of its argument, defendant relies in large part on this court's decision in *Wesley v. Don Stein Buick, Inc.*, 42 F.Supp.2d 1192 (D.Kan.1999). Specifically, defendant highlights the following excerpt from this court's *Wesley* decision:

[T]he court believes that the Tenth Circuit would conclude that a plaintiff asserting a § 1981 claim in the context of a retail transaction must demonstrate that he or she was actually prevented from making a purchase or that he or she would have attempted to make a purchase if the defendant had not interfered. Moreover, virtually all federal

---

5. In the introductory section of defendant's brief concerning plaintiff's section 1981 claim, defendant asserts that plaintiff cannot establish a prima facie case of discrimination (*i.e.*, because he did not suffer the actual loss of a contract interest) and that even if plaintiff could establish a prima facie case, he cannot show that defendant's nondiscriminatory reasons for its conduct are pretextual. Aside

from this reference in the introductory paragraph, however, defendant never again mentions its pretext argument in connection with plaintiff's section 1981 claim. Thus, the only issue that is ripe for the court's consideration is whether plaintiff's section 1981 claim fails as a matter of law because he obtained the loan from defendant.

courts that have analyzed section 1981 claims in the retail merchandise context have required plaintiffs to show that they were actually prevented from making a purchase.

42 F.Supp.2d at 1201. The court's wording in *Wesley* could have been more clear, perhaps, but the *Wesley* case is simply not on point here. The plaintiff in *Wesley* alleged that she was denied the opportunity to contract with the defendant. Specifically, the plaintiff alleged that defendant interfered with her attempt to purchase a car by essentially chasing her off the lot. However, because the plaintiff failed to demonstrate that she had anything more than a general interest in the defendant's automobiles and failed to demonstrate that she would have attempted to purchase a car had the defendant's agents not chased her away, the court granted summary judgment for the defendant. The essence of the court's ruling in *Wesley*, then, was that a plaintiff claiming the loss of contract interest had to establish that he or she actually would have attempted to enter the contract but for the defendant's conduct. That is not the issue in this case.

While the Tenth Circuit has not had the opportunity to address the precise question raised by defendant's motion (*i.e.*, whether a plaintiff is precluded from asserting a section 1981 claim when he or she successfully enters the contract with the defendant), the Circuit in *Hampton* recognized the principle that section 1981 "has been applied to discrimination claims arising in the retail sector and restaurant industry, *when a contract has been established.*" 247 F.3d at 1102 (emphasis added). In support of its statement, the Circuit cited to two district court cases, *Bobbitt v. Rage Inc.*, 19 F.Supp.2d 512, 518–20 (W.D.N.C.1998) and *Washington v. Duty Free Shoppers, Ltd.*, 710 F.Supp. 1288, 1289–90 (N.D.Cal. 1988). The court, then, turns to these

two cases for additional guidance in analyzing defendant's motion.

In *Bobbitt*, the court denied the defendant's motion to dismiss the plaintiffs' section 1981 claim where the plaintiffs alleged that they, unlike non-minority guests, were required to prepay for their food at the defendant's restaurant. 19 F.Supp.2d at 518–19. The plaintiffs, however, readily admitted that the restaurant did in fact seat them, take their order, and serve them their food. *Id.* at 519. According to the court, the restaurant, by requiring the African American customer-plaintiffs to prepay for their food, denied the plaintiffs the "enjoyment of all ... terms and conditions of the contractual relationship" that were enjoyed by white customers patronizing the restaurant. *Id.* (quoting 42 U.S.C. § 1981(b)). The *Bobbitt* court found it irrelevant that the plaintiffs had been served. *See id.* In short, the court denied the motion to dismiss because the restaurant "altered a fundamental characteristic of the service provided by the public accommodation solely on the basis of race." *Id.* at 519–20. Similarly, in *Washington*, the district court denied summary judgment to the defendant where the plaintiffs, African American customers at defendant's store, alleged that they were required to show a passport and airline tickets before shopping at defendant's store, while non-minority customers were not required to do so. 710 F.Supp. at 1289–90.

■ These cases, then, cited with approval in *Hampton*, suggest that a section 1981 claim is actionable where different conditions are placed upon an African American plaintiff's right to enter contractual relations, even when that plaintiff eventually enters the contract. As another district court has held:

> [I]mposing an additional condition upon minority customers that is not imposed upon non-minorities states a section

1981 claim for discrimination concerning the making and enforcing of contracts. Where additional conditions are placed on minorities entering the contractual relationship, those minorities have been denied the right to contract on the same terms and conditions as is enjoyed by white citizens.

*Joseph v. New York Yankees Partnership,* No. 00 Civ. 2275(SHS), 2000 WL 1559019, at *4 (S.D.N.Y. Oct. 19, 2000) (quoting 42 U.S.C. § 1981(b)). In *Joseph,* the plaintiff, an African–American female, alleged that she was initially refused access to the Stadium Club at Yankee Stadium based on the Club's dress code. *Id.* at *1. The plaintiff then returned to her car in the parking lot, changed into a t-shirt (she had been wearing a tank top), returned to the club and was served. *Id.* According to the plaintiff, non-minority women inside the club were wearing tank tops. *Id.* In its motion for summary judgment, the defendant, like defendant here, argued that the plaintiff had not demonstrated any actual loss of a contract interest because she was served. *Id.* at *3. The court soundly rejected that argument:

> [U]nlike in cases involving mere delay of service, there is an issue of fact as to whether a different condition was placed upon Ms. Joseph's right to enter contractual relations: allegedly, unlike non-minority patrons, she was required to observe the dress code in order to enter the Stadium Club. She argues that the racially discriminatory enforcement of the dress code adversely affected the basic terms and conditions of her contract to enter and be served. Assuming her allegations are true and that she was required to fulfill an additional condition that non-minority customers were not before she could contract for dining services, she would be limited in her right to contract as she could not enjoy "all benefits, privileges, terms, and conditions of the contractual relationship"

to the same extent as non-minority customers.

*Id.*

In denying the defendant's motion for summary judgment, the *Joseph* court looked to the *Bobbitt* and *Washington* decisions cited by the Tenth Circuit in *Hampton.* In addition, the court looked to a decision from the Northern District of Illinois, *Hill v. Shell Oil Co.,* 78 F.Supp.2d 764 (N.D.Ill.1999). There, the court rejected the defendant's argument that because the African–American plaintiffs were ultimately able to purchase gasoline—after complying with an additional "prepay" requirement—there was no deprivation of rights pursuant to section 1981. *Id.* at 777. According to the *Hill* court, the "pre-pay requirement adversely affected the basic terms and conditions of [the plaintiffs'] contract to purchase gasoline" and the "discrimination took place at the point of sale, directly implicating plaintiffs' rights to contract and to enjoy all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* The court ultimately denied the defendant's motion to dismiss. *Id.*

 For the reasons set forth in *Bobbitt, Washington, Joseph* and *Hill,* the court concludes that defendant is not entitled to summary judgment with respect to plaintiff's section 1981 claim. Simply put, factual questions exist with respect to whether plaintiff was required to satisfy additional conditions before obtaining a loan from defendant that non-minorities were not required to satisfy. From plaintiff's evidence concerning his discussion on February 19 with Mr. Nill, a reasonable factfinder could conclude that the bank imposed different criteria with respect to plaintiff's loan application than it did with respect to the applications submitted by non-minorities. According to plaintiff's evidence, if he had been white, the bank

would not have attempted to ascertain whether his check was stolen; would not have driven by the property identified on his application; and would not have called the police for "assistance." Assuming the factfinder believed plaintiff's evidence, then plaintiff would establish that the terms and conditions of his contract with the bank were less favorable than those enjoyed by white customers. Such is the essence of a section 1981 claim and defendant's motion is therefore denied.

## V. Plaintiff's False Arrest Claim

Plaintiff's false arrest claim was based on his detention by the police in the bank parking lot on February 18, 1999. Defendant moved for summary judgment on this claim on three separate bases-that plaintiff's alleged detention did not constitute an "arrest" for purposes of his claim; that, even assuming plaintiff was arrested, the arrest was not instigated by defendant; and that, even assuming plaintiff was arrested, the police had legal cause for the arrest. As the court noted during the January 5, 2001 telephone conference, there is sufficient evidence to support the conclusion that plaintiff was arrested on February 18, 1999. Nonetheless, as will be explained in more detail below, no reasonable factfinder could conclude that defendant instigated plaintiff's arrest. For this reason, the court granted summary judgment in favor of defendant on plaintiff's false arrest claim.[6]

■ Under Kansas law, a plaintiff seeking to recover for false arrest must prove that he or she was "unlawfully caused to be arrested" by the defendant and, "though it is not necessary that the arrest was directly ordered" by the defendant, "it must appear that they either instigated it, assisted in the arrest, or by some means

directed, countenanced or encouraged it." *Thompson v. General Finance Co.,* 205 Kan. 76, 87–88, 468 P.2d 269 (1970). In analyzing whether a particular defendant has directed or instigated an arrest, the Kansas Court of Appeals has noted:

> It is not necessary, to impose liability, that the defendant expressly direct the arrest. Nor need he be present when the arrest is actually made. However, he must take some active part in bringing the arrest about, that is, there must be some affirmative act on his part which induces the officer to make the arrest.

*Thurman v. Cundiff,* 2 Kan.App.2d 406, 407, 580 P.2d 893 (1978) (quoting 32 Am. Jur.2d *False Imprisonment* § 35).

■ Relying on the "some affirmative act" language in *Thurman,* plaintiff contends that defendant's calling the police and essentially "directing" the police to plaintiff is sufficient to establish defendant's liability for his subsequent arrest. The court disagrees. While it is undisputed that Ms. Cain telephoned the police, it is also undisputed that the only information the officers had was that suspicious characters were in the parking lot. Thus, regardless of what Ms. Cain told the dispatcher, the officers had virtually no information about plaintiff prior to doing their own independent investigation. There is no evidence that any bank employees had anything to do with that subsequent investigation. Significantly, the police questioned and detained plaintiff outside the bank—no bank employees were present during this time. In fact, after one of the officers did go into the bank (where he presumably talked to bank employees), he reported that everything was fine and the detention ended. There is simply no evidence, then, that any information provided

---

**6.** The court, then, declines to address defendant's argument concerning whether the police had legal cause for the arrest.

by the bank led to plaintiff's arrest. In such circumstances, no reasonable factfinder could conclude that defendant instigated plaintiff's arrest. *Compare Thompson,* 205 Kan. at 88, 468 P.2d 269 (upholding jury verdict in favor of plaintiff on false arrest claim where defendant instigated arrest by providing false information to county attorney and that false information culminated in arrest) *and Thurman,* 2 Kan.App.2d at 409–10, 580 P.2d 893 (upholding jury verdict for plaintiff on false arrest claim where there was very little evidence that the police conducted an independent investigation beyond questioning the defendant) *with Palton v. Armour Swift–Eckrich,* No. CIV.A. 99–2466–GTV, 2000 WL 1715297, at *1 (D.Kan. Nov. 9, 2000) (granting 12(b)(6) motion on plaintiff's false arrest claim where plaintiff merely alleged that his plant manager called the police) *and Wright v. Montgomery Ward & Co.,* 814 F.Supp. 986, 990 (D.Kan.1993) (granting summary judgment in favor of defendant on plaintiff's false arrest claim where, after making the initial call to the police about the suspected crime, defendant did not have any further role in whether charges would be filed), *aff'd,* 25 F.3d 1059 (10th Cir.1994). In short, the only reasonable conclusion that can be drawn from the facts presented is that defendant "merely informed the officers of the circumstances and left it to the officers to take such action as the officers deemed proper." *See Thurman,* 2 Kan. App.2d at 411, 580 P.2d 893. Summary judgment, thus, is appropriate. *See id.*

## V. Plaintiff's Negligent Infliction of Emotional Distress Claim

Plaintiff's claim for negligent infliction of emotional distress was based primarily on defendant's calling the police. Defendant moved for summary judgment on this claim based on the undisputed fact that plaintiff suffered no physical injury as a result of defendant's conduct. During the January 5, 2001 telephone conference, the court granted defendant's motion on this basis as explained more fully below.

It is well settled under Kansas law that "there can be no recovery for emotional distress caused by the negligence of another unless accompanied by or resulting in physical injury." *Humes v. Clinton,* 246 Kan. 590, 598, 792 P.2d 1032 (1990) (citing cases). Conceding this requirement, and recognizing that he did not suffer the requisite physical injury, plaintiff sought to avoid summary judgment by invoking an exception to the physical injury rule. Specifically, plaintiff alleged that defendant's conduct was willful or wanton. *See Bowman v. Doherty,* 235 Kan. 870, 877, 686 P.2d 112 (1984) (physical injury rule does not apply when the injurious conduct is willful or wanton). The pretrial order, however, is devoid of any allegations suggesting that defendant acted in a willful or wanton manner. In fact, plaintiff has not even claimed punitive damages in this case, which also undermines his contention at this stage in the proceedings that defendant's conduct was wanton or willful. Plaintiff, then, waived his right to assert this exception. *See Hullman v. Board of Trustees of Pratt Community College,* 950 F.2d 665, 668 (10th Cir.1991) (issues not preserved in the pretrial order have been eliminated from the action). Without the benefit of this exception, plaintiff is left with the general rule that physical injury is required to recover for emotional distress caused by the negligence of another. Again, it is undisputed that plaintiff suffered no such injury. Thus, the court granted summary judgment in favor of defendant on plaintiff's claim for negligent infliction of emotional distress.

## VI. Plaintiff's Intentional Infliction of Emotional Distress Claim

Like his claim for negligent infliction of emotional distress, plaintiff's claim for in-

tentional infliction of emotional distress was based primarily on defendant's calling the police on February 18, 1999. Defendant moved for summary judgment on this claim on the grounds that plaintiff had not shown that defendant's conduct was outrageous under Kansas law.[7] On January 5, 2001, the court granted defendant's motion on this basis. The court will now expand on its analysis of plaintiff's claim and defendant's motion.

 As this court has previously noted, Kansas has set a very high standard for the common law tort of intentional infliction of emotional distress or, as it is sometimes referred to, the tort of outrage. *See, e.g., Okoye v. Medicalodge North,* 45 F.Supp.2d 1118, 1125 (D.Kan. 1999). To establish a prima facie case of intentional infliction of emotional distress, plaintiff must show that (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) there is a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe. *Bolden v. PRC Inc.,* 43 F.3d 545, 553 (10th Cir.1994) (citing *Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205 (1986)); *Smith v. Welch,* 265 Kan. 868, 875, 967 P.2d 727 (1998). Under Kansas law, liability for emotional distress has two threshold requirements. To resolve a motion for summary judgment on an emotional distress claim, the court must determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it. *Penry v. Federal Home Loan Bank,* 155 F.3d 1257, 1264 (10th Cir.1998) (citing *Lindemuth v. Goodyear Tire & Rubber Co.,* 19 Kan. App.2d 95, 864 P.2d 744 (1993) (quoting *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175 (1981))); *Welch,* 265 Kan. at 875, 967 P.2d 727. As set forth below, even assuming that plaintiff has suffered the requisite emotional distress, summary judgment is appropriate because plaintiff has not shown that defendant's conduct was sufficiently extreme and outrageous to permit recovery under Kansas law.

To constitute sufficiently extreme and outrageous conduct, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Bolden,* 43 F.3d at 554 (citing *Roberts v. Saylor,* 230 Kan. 289, 293, 637 P.2d 1175 (1981)). Plaintiff has not alleged any conduct by defendant which was so outrageous in character or so extreme in degree as to be beyond the bounds of decency or to be regarded as atrocious and utterly intolerable in a civilized society. In support of his argument that defendant's conduct was extreme and outrageous, plaintiff relies primarily on the Kansas Supreme Court's decision in *Taiwo v. Vu,* 249 Kan. 585, 822 P.2d 1024 (1991). In *Taiwo,* the Kansas Supreme Court found that the behavior of the defendant, Ms. Vu, was "intentional and malicious." *Id.* at 593, 822 P.2d 1024. As the court noted, Ms. Vu "assaulted, battered, and

---

7. Defendant also moved for summary judgment on the grounds that plaintiff has not suffered severe emotional distress; that plaintiff has failed to establish a causal connection between any conduct by defendant and his alleged emotional distress; and that plaintiff has failed to show that defendant intentionally caused emotional distress to plaintiff. The court declines to address these arguments given its conclusion that defendant's conduct was simply not outrageous under Kansas law.

falsely imprisoned Mrs. Taiwo." *Id.* Furthermore, Ms. Vu lied to a law enforcement officer by falsely claiming that Mr. Taiwo had vandalized her car; she filed a false police report against the Taiwos concerning the vandalism; and she induced an employee to lie to the police about the Taiwos' involvement in the vandalism. *Id.* According to the court, Ms. Vu "abused the criminal justice process to her own ends." *Id.* Ultimately, the court concluded that such conduct was sufficiently extreme and outrageous to permit recovery under Kansas law and upheld a jury verdict in favor of the Taiwos. *Id.*

According to plaintiff, defendant, like Ms. Vu, "abused the criminal justice process." The court disagrees and easily concludes that defendant's conduct here falls far short of the intentional and malicious behavior described in *Taiwo.* There is no evidence here, for example, that defendant provided false information to the police concerning plaintiff. Moreover, unlike the situation in *Taiwo,* there is no evidence that defendant contacted the police to serve some nefarious purpose. There is no evidence that any of defendant's agents lied to anyone else about plaintiff. For these reasons, *Taiwo* is easily distinguishable from the facts present here. Even assuming defendant's agents mistreated plaintiff based on his race, such circumstances simply do not rise to the level of extreme and outrageous under Kansas law. *See Bolden,* 43 F.3d at 554 ("Kansas courts have been reluctant to extend the outrage cause of action to discrimination and harassment claims."). For these reasons, the court granted defendant's motion for summary judgment on plaintiff's claim. *See Nwakpuda v. Falley's, Inc.,* 14 F.Supp.2d 1213, 1218–19 (D.Kan.1998) (granting 12(b)(6) motion on plaintiff's outrage claim where plaintiff alleged that store clerk misidentified plaintiff as individual who previously had robbed store and defendant's store manager telephoned police and detained plaintiff for more than twenty minutes without explanation while waiting for police to arrive).

## VII. Scheduling for Trial

The result of this memorandum and order is that this case should proceed forward for trial. Accordingly, dates must be established for the trial and for the other matters which need to be addressed before the trial. The court will establish that schedule in a separate supplemental pretrial order to be filed this same date.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (doc. # 35) is **denied** with respect to plaintiff's section 1981 claim and, as previously stated in the court's order of January 5, 2001, is **granted** with respect to plaintiff's state law claims.

**IT IS SO ORDERED.**