**Dederick KELLY, Plaintiff,**

v.

**BANK MIDWEST, N.A., Defendant.**

**No. 00–2042–JWL.**

United States District Court,
D. Kansas.

Nov. 26, 2001.

John W. Kurtz, Hubbard & Kurtz, LLP, Kansas City, MO, for plaintiff.

Daniel D. Crabtree, Stinson, Mag & Fizzell, P.C., Leawood, KS, Brian R. Markley, Stinson, Mag & Fizzell, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, Chief Judge.

In this action, plaintiff Dederick Kelly claims that defendant Bank Midwest discriminated against him on the basis of his race in violation of 42 U.S.C. § 1981 in connection with his efforts to obtain a loan.[1] Both parties having waived their jury demands, a trial to the court was held from October 2, 2001 through October 4, 2001. The court has thoroughly considered the evidence and arguments presented at trial and is now prepared to issue its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2] For the reasons set forth fully below, the court finds in favor of plaintiff on his section 1981 claim and awards him $40,000.00 in compensatory damages.

## I. Findings of Fact

Defendant Bank Midwest is a bank which operates branches in northern Missouri and eastern Kansas. One of defendant's branches is located at 78th Street and State Avenue in Kansas City, Kansas. Plaintiff Dederick Kelly, an African American male, visited this location on three consecutive days in February 1999. On two of the three days, plaintiff was accompanied by his brother, Willie Kelly. Both brothers were attempting to obtain a loan from the bank. Plaintiff's section 1981 claim arises out of events occurring at the bank in connection with plaintiff's efforts to obtain his loan and culminating in the police being called to the bank to apprehend the brothers.

As will be explained more thoroughly below, the court rejects defendant's argument that the events that took place at the bank with respect to the Kelly brothers were caused by a series of miscommunications that nonetheless stemmed from legitimate concerns about the circumstances presented by the Kelly brothers (primarily, Willie Kelly's unusual driver's license). Rather, the court finds that defendant's actions with respect to plaintiff and Willie Kelly were based on racial stereotyping on the part of certain bank employees, particularly Kellie Hunt and Victor Grabbe. Stated another way, the court finds that Ms. Hunt and Mr. Grabbe reacted the way they did to the circumstances presented by Willie Kelly and plaintiff based on stereotyped thinking. Specifically, Ms. Hunt and Mr. Grabbe subjected plaintiff and his brother to a higher level of scrutiny and suspicion based on an assumption that the Kellys, as African–Americans, were more likely than not attempting to defraud the bank.

The court reaches its conclusion that race factored into the bank's conduct based on the court's opportunity to assess the demeanor and credibility of the witnesses at trial. Simply put, the court found that the bank's key witnesses were not credible.[3] For example, there were

---

1. In his initial complaint, plaintiff also asserted state law claims of false arrest, negligent infliction of emotional distress and intentional infliction of emotional distress. The court previously granted summary judgment in favor of defendant on those claims. *See Kelly v. Bank Midwest, N.A.,* 161 F.Supp.2d 1248, 1258–61 (D.Kan.2001).

2. During the trial, plaintiff submitted designations of Jon Montgomery's deposition testimony, Officer Brian Whisner's deposition testimony and Officer Dan Conchola's deposition testimony. Defendant objected on hearsay grounds to one excerpt from the portion of Officer Whisner's deposition designated by plaintiff. The objection is sustained and the court has disregarded that excerpt from Officer Whisner's deposition.

3. On the other hand, the court found that plaintiff and his brother were highly credible and genuine. Moreover, unlike the bank's key witnesses, the testimony of plaintiff and the testimony of his brother were consistent on all relevant points.

numerous instances of glaring inconsistencies in the testimonies of Ms. Hunt and Mr. Grabbe-inconsistencies that significantly damaged the credibility of these witnesses and suggested a belated attempt to legitimize conduct on the part of the bank that, in fact, was unwarranted. Moreover, the explanations offered by the bank's witnesses as to why those witnesses acted the way they did with respect to plaintiff and Willie Kelly simply were not believable to the court. In addition, certain portions of Mr. Grabbe's testimony affirmatively suggested that he believed (without any rational basis for so believing) that the Kelly brothers were dangerous and a threat to the safety of bank customers and bank assets.

It also appeared to the court that Ms. Hunt, at times, was struggling to tell the truth. By way of example, Ms. Hunt, at trial, was asked by plaintiff's counsel about her use of the word "nigger." Ms. Hunt became visibly uncomfortable and highly evasive in her response. While Ms. Hunt admitted that it was a word that she had used in the past, she attempted to suggest that her use of the word was limited to one occasion when she was in grade school at a time when she did not know what the word meant. She further testified (rather defensively) that her only subsequent use of that word has been when she repeats verbatim a story that she has heard from someone else. During her deposition, however, Ms. Hunt's response was quite different. There, when asked "are you able to tell me anything at all about any situations in which you've used [the word "nigger"]?" Ms. Hunt replied, "I have no idea." Similarly, when asked in her deposition about the frequency of her use of the word, whether it was one time or hundreds of times, Ms. Hunt replied "I have no idea how many times I've used that word." While Ms. Hunt attempted to distance herself from her prior testimony by claiming that she was "caught off guard" by counsel's questions during her deposition, the court believes that precisely because Ms. Hunt was caught off guard her answers in her deposition were more candid than those she gave on the stand after having time to reflect about what her answer "should" be. The court is persuaded that race entered into and influenced Ms. Hunt's actions during her interaction with the Kellys in February 1999.

For the foregoing reasons (which will be explained more fully below), the court finds that the likely reason for defendant's actions 'was plaintiff's and Willie Kelly's race. That having been said, the court reiterates that it does not necessarily conclude that the bank's employees were motivated by racial animus or ill will, or that the bank's employees maliciously set about to treat plaintiff badly because of his race. The court concludes that a more subtle form of discrimination-but actionable discrimination nonetheless-was at work here.

*February 17, 1999*

On February 17, 1999, plaintiff and his brother, Willie Kelly,[4] went to defendant Bank Midwest for the purpose of securing loans. Specifically, plaintiff and his brother each intended to purchase a certificate of deposit (CD) for $1000 and, at the same time, borrow $1000 using the CDs as collateral. The purpose of these transactions was to allow plaintiff and his brother to build or reestablish their credit.[5] To pur-

---

**4.** To avoid confusion, the court will refer to Dederick Kelly as "plaintiff" and will refer to plaintiff's brother using his full name, Willie Kelly.

**5.** During this time period, the Kelly brothers owned a mortgage brokering business and were also in the business of "rehabbing" houses (*i.e.*, buying a house, fixing it up, and then renting it or selling it). They wanted to build credit in order to get a line of credit for their businesses and/or to get better interest rates with respect to the houses that they were either buying or refinancing.

chase the CDs, plaintiff and his brother each presented an instrument entitled "Official Check." The checks reflected that they were issued by Mercantile Bank on the previous day, February 16, 1999. One of the two checks was purchased by plaintiff and made payable to his brother. The other check was purchased by Willie Kelly and made payable to plaintiff.

Upon entering the bank, plaintiff advised the receptionist about the nature of the transactions he and his brother wanted to complete. The receptionist directed the Kelly brothers to the waiting area and advised them that someone would help them shortly. After a lengthy wait, one of defendant's customer service representatives, Kellie Hunt, approached the brothers and stated that she could help one of them. Willie Kelly then followed Ms. Hunt to her desk and the two discussed the nature of the transaction that Willie Kelly wished to complete. Significantly, Ms. Hunt testified that in her mind there was nothing suspicious about the type of transaction that Willie Kelly wanted to do and there was nothing suspicious about the fact that plaintiff was interested in the same transaction. She further testified that she had seen that particular type of transaction done before for the purpose of establishing credit. Finally, Ms. Hunt conceded that Willie Kelly, who was neatly dressed in business casual attire, was courteous and polite at all times during his visit to the bank.

Ms. Hunt then asked Willie Kelly for his driver's license and told him that she need-ed to make a copy of it. Upon looking at Willie Kelly's license, Ms. Hunt apparently had two concerns-neither of which she voiced to Willie Kelly. According to Ms. Hunt, her first concern was that the person sitting at her desk "differed" from the person pictured on the license. At trial, however, Ms. Hunt could not identify any specific differences she perceived other than that one person-either the person sitting at her desk or the person pictured on the license, she could not remember which-had a "gap in the teeth" and the other person did not. Ms. Hunt's second concern was that Willie Kelly presented a driver's license issued by the state of Oklahoma but bearing a Kansas City, Missouri address. Ms. Hunt did not provide Willie Kelly an opportunity to explain his unusual license (indeed, he did not know that she was concerned about the license in any respect).[6] Instead, Ms. Hunt apparently presumed (or at least strongly suspected) that the African American person sitting at her desk was presenting a fictitious license in an effort to commit a fraudulent transaction. In fact, the license was perfectly valid and legal under Oklahoma law.

At trial, the court had the opportunity to compare Willie Kelly to the picture on his license. Based on what the court had heard in the testimony of Ms. Hunt (and, as described later, in the testimony of Mr. Grabbe), and based on the fact that pictures on driver's licenses are often less than perfect likenesses of the present appearances of the holders of those licenses, the court expected to see a marked differ-

6. The court cannot but wonder why Ms. Hunt did not simply ask Willie Kelly about this admittedly curious driver's license. That would seem to be the first thing one would do if one were not predisposed to assume that the person presenting the unusual license was up to no good. Willie Kelly had given Ms. Hunt no rational reason to jump to the conclusion that he was bent on mischief. This court, then, infers that Willie Kelly's race played a part in Ms. Hunt's failure to seek from him an explanation about his license and, thus, potentially to avoid the entire problem. The court does not draw this inference in isolation but rather from the totality of the circumstances, including its opportunity to evaluate the demeanor of the witnesses while testifying in order to help it weigh and reject other inferences which it might have been able to draw from these facts.

ence between Willie Kelly and the picture on his license. For this reason, the court was shocked when it actually compared Willie Kelly to his driver's license picture and found that, at least in October 2001,[7] the picture on Willie Kelly's license unquestionably looked like Willie Kelly. The court, then, draws two possible inferences from Ms. Hunt's testimony about the alleged differences between Willie Kelly and the picture on the license presented by Willie Kelly. The first possible inference is that Ms. Hunt, in February 1999, did not perceive any differences between Willie Kelly and the license picture but, at some point before trial, devised this theory in an attempt to justify the subsequent chain of events that occurred with respect to Willie Kelly and plaintiff. Giving the bank's witnesses the benefit of the doubt, the court is reluctant to draw this inference. The second possible inference is that Ms. Hunt did actually perceive such differences. However, the alleged differences are so nonevident to the court as to suggest that Ms. Hunt, based on her predilection to suspect that Willie Kelly, as an African–American, was attempting to defraud the bank, subjected Willie Kelly's driver's license to a heightened level of scrutiny in an effort to articulate some "legitimate" reason to question Willie Kelly's bona fides.

In any event, after viewing Willie Kelly's license, Ms. Hunt stepped away from her desk to make a copy of the license. While she was away from her desk and according to what she described as her standard procedure with respect to any new customer, Ms. Hunt contacted ChexSystems to inquire whether Willie Kelly had had any accounts closed due to insufficient funds.

She learned from ChexSystems that Willie Kelly had bounced at least one check drawn on an Oklahoma bank. Ms. Hunt then approached Victor Grabbe, the security guard on duty at the bank that day. Ms. Hunt showed Mr. Grabbe the driver's license that Willie Kelly had presented to her and asked him whether he had ever seen anything like it. Mr. Grabbe responded that he had not ever seen a driver's license issued by one state but reflecting an address in another state. Ms. Hunt also asked Mr. Grabbe to compare the picture on the driver's license with the individual sitting at her desk because, according to Mr. Grabbe, Ms. Hunt had some concerns or doubts about whether the person at her desk was the same person in the picture.

At trial, Mr. Grabbe testified that, based on his comparison of the person pictured on the driver's license and the person sitting at Ms. Hunt's desk, he concluded that there were "more dissimilarities than similarities." Specifically, Mr. Grabbe testified that he thought the individual sitting at Ms. Hunt's desk could have been a family member of the person in the picture because they had "similar bone structure and such," but the "cheekbone structure, location, things of this nature . . . didn't seem quite right between the facial features of the individual and the picture on the license." Based on the court's observation of Willie Kelly's license at trial, however, the person pictured on the license quite obviously was Willie Kelly. In addition, Mr. Grabbe's statement about the "cheekbone structure" of Willie Kelly as compared to the picture was simply not credible. Acknowledging the possibility that Mr. Grabbe, in February 1999, did not

---

7. The court recognizes that Willie Kelly may have weighed as much as twenty pounds less in February 1999 than the weight indicated on his driver's license. Nonetheless, Ms. Hunt's testimony in no way indicated that the differences she allegedly perceived between Willie Kelly and the driver's license picture (*e.g.*, a gap in the teeth) were based on weight differences.

perceive any differences between Willie Kelly and the license picture, *see supra* p. 1199, the court draws the inference that Mr. Grabbe, like Ms. Hunt, was stretching to find some reason to doubt Willie Kelly's bona fides because he, too, presumed that Willie Kelly was up to no good.

After her discussion with Mr. Grabbe, Ms. Hunt advised her supervisor, Cathy Turner, about the situation and, in particular, the concerns that she had about the license presented by Willie Kelly. While Ms. Hunt and Ms. Turner were discussing the license, plaintiff appeared in the doorway of Ms. Turner's office and asked Ms. Turner whether she could assist him.[8] Ms. Turner proceeded to assist plaintiff with his transaction and Ms. Hunt left Ms. Turner's office. Plaintiff advised Ms. Turner about the nature of the transaction he wished to complete. Although Ms. Turner testified that she did not "understand the logic" of plaintiff's transaction,[9] no evidence was presented that Ms. Turner thought the transaction was suspicious or that she was concerned about it in any way. Moreover, it was undisputed at trial that plaintiff, like his brother, was courteous and polite at all times during his visit to the bank and was neatly dressed in business casual clothes.

While assisting plaintiff with his transaction, Ms. Turner apparently became concerned about plaintiff's driver's license in two respects-neither of which she voiced to plaintiff. First, she testified that she did not think that the picture on the license looked like plaintiff. Second, Ms. Turner testified that she thought it was strange that plaintiff's driver's license number did not match his social security number. As with Willie Kelly's license, the court also had the opportunity to view plaintiff's license at trial and, like the court's conclusion with respect to Willie Kelly's license, the court concluded that plaintiff and the person depicted on the license were quite obviously the same person. Moreover, with respect to Ms. Turner's apparent concern that plaintiff's driver's license number did not match his social security number, the court finds it difficult to believe that an experienced bank employee working in Kansas would not know that Kansas does not require the license number to match the holder's social security number and, in fact, that many people (including the undersigned judge) choose to use a different number for their license for security reasons.

The court is struck that on the same day in the same bank, two African–American men each presented his driver's license to a different bank employee and both employees allegedly questioned the individual's likeness to the license picture and questioned the validity of the license itself. Even without drawing the inference that the bank witnesses concocted these "concerns" after-the-fact in an attempt to bolster the bank's account of what happened and why, the court finds that Ms. Turner's testimony about her concerns with respect to plaintiff's license further supports the court's conclusion that certain of the bank witnesses were, in essence, searching for a

8. Inconsistent evidence was presented at trial concerning this point. Defendant's witnesses testified that plaintiff appeared in Ms. Turner's doorway asking for help after declining help from several other employees. Plaintiff denies that he ever declined help from anyone. He further testified that Ms. Turner came out to the waiting area to assist plaintiff and that he did not approach Ms. Turner in her office. Ultimately, the court concludes that this piece of evidence is not significant in terms of analyzing the ultimate issues in the case. Thus, because the court concludes that plaintiff prevails on his claim in any event, the court adopts defendant's version of the events in this respect.

9. Ms. Turner had very little experience handling or processing loans.

"legitimate" reason to doubt the Kelly brothers because the bank employees assumed on flimsy evidence that the Kellys, as African–Americans, were attempting to defraud the bank in some fashion.

In any event, Ms. Turner noticed that plaintiff's signature on his loan application matched the signature on the license so she was ultimately convinced that the person pictured in the license and the person she was assisting were the same person. Nonetheless, Ms. Turner testified that she was still concerned about plaintiff's transaction because she knew that plaintiff was with Willie Kelly and Willie Kelly's license "was strange." After completing the paperwork associated with plaintiff's transaction, Ms. Turner advised him that she would send the paperwork to the bank's loan department, that they would make a decision as to whether the bank would make the loan, and then someone would get in touch with him.

In the meantime, after leaving Ms. Turner's office, Ms. Hunt telephoned Bill Hall, the bank's fraud and forgery officer. She explained to Mr. Hall her concerns about the license that Willie Kelly had presented and advised him about the ChexSystem report concerning Willie Kelly. Mr. Hall advised Ms. Hunt that he would investigate the situation and would report back to her. Ms. Hunt then showed Mr. Grabbe the instrument that Willie Kelly had presented. Ms. Hunt testified, of course, that there was nothing suspicious about the type of transaction that Willie Kelly wanted to do and there was nothing suspicious about the fact that plaintiff was interested in the same transaction. Therefore, she apparently believed, based on her assumption that the license presented by Willie Kelly was fictitious, that the check presented by Willie Kelly was fraudulent or that it did not belong to him. According to Mr. Grabbe, the piece of paper was "made out to one individual and signed by the other individual, and from my understanding of what she was explaining to me, the signature at the bottom was also the holder of the check."

The court interprets Mr. Grabbe's testimony to mean that Ms. Hunt, at least at the time, may have been suspicious about the nature of the transactions the Kelly brothers were attempting to complete (i.e., the fact that the checks mirrored each other in that one check was purchased by one brother and made payable to the other and the other check was purchased by the other brother and made payable to the first). At trial, of course, Ms. Hunt testified that she, at the time, did not think the nature of the transactions was suspicious in any way. A reasonable inference that the court draws from these varying accounts of what Ms. Hunt actually thought about the nature of the transactions is that, having since learned that the transactions were legitimate, Ms. Hunt has changed her mind about whether she was suspicious at the time. This is yet another example of why the court found Ms. Hunt's testimony less than credible.

At that point, Mr. Grabbe called 911. The call was based only on the driver's license presented by Willie Kelly and the instruments presented by the Kelly brothers. Moreover, it was undisputed at trial that the Kelly brothers never exhibited any threatening or unusual behavior. Nonetheless, Mr. Grabbe called 911 "requesting for someone not so much to back me up but to be there for the security of the customers and to make things just a little more easy." He further testified that he "had a feeling that something could erupt." But there was simply no rational basis for Mr. Grabbe to believe that any customers were at risk. The court cannot understand from the facts in the record why Mr. Grabbe would believe "something could erupt" based solely on an unusual

license. Thus, the court finds that something else-namely, race-factored into Mr. Grabbe's thinking on that day.

Mr. Grabbe also testified that he was concerned that the Kellys were trying to "get away with cash for a fraudulent piece of paper" and he "was taking all precautions . . . necessary at that point to protect both personnel and the bank assets." Again, no evidence was presented at trial that personnel were at risk or that there existed any rational basis to think that personnel were at risk. In terms of the bank assets, there was no reason to think that the assets needed "protection"-the bank could simply refuse to complete the transactions requested by the Kelly brothers. Mr. Grabbe also testified that he wanted to secure the property due to a "gut feeling." Mr. Grabbe could not recall having a similar "gut feeling" about any white loan applicants. In short, Mr. Grabbe's testimony caused the court to believe that something else must have factored into his decision to call the police. In the absence of any evidence suggesting that the Kelly brothers were a threat, the court believes that the Kellys' race was that factor.

According to Mr. Grabbe, he did not intend for the Kelly brothers to ever know that the police had been called. In fact, he requested that the officers come to the bank with "no lights, no sirens." Specifically, Mr. Grabbe testified that he "was going to meet the police officers outside the bank, explain what was going on inside, and my fears of what was going on inside, ask them to come in, have a cup of coffee. . . ." He testified that he simply wanted the officers present in the bank because he knew that if "it turned out to be a bad situation, that [he] would not be able to physically handle both of them by [him]self." This testimony clearly suggests that Mr. Grabbe believed that it was possible that the Kelly brothers would resort to physical violence during the course of their transactions.

In any event, despite Mr. Grabbe's testimony that he called the police merely as a precautionary measure, Ms. Hunt testified that Mr. Grabbe told her essentially to go back and the keep the conversation going with the Kellys until the police came.[10] Ms. Hunt's testimony, then, indicates that Mr. Grabbe intended the police to have contact with the Kellys. Finally, while Mr. Grabbe could recall other incidents where the police had been called to the bank based on suspicious activity (though the only specific example Mr. Grabbe could provide was an instance when a man left the bank with a sports bag full of cash), he could not recall another time when he had requested the police to come to the bank with "no lights, no sirens." For whatever reason, no police officer ever responded to Mr. Grabbe's call and no officers appeared at the bank that day.

After her discussions with Mr. Grabbe, Ms. Turner and Mr. Hall, Ms. Hunt returned to her desk.[11] She advised Willie Kelly about the ChexSystems report. She further advised him that, because of the ChexSystems report and pursuant to the bank's policy, she could not complete his transaction without manager approval. Finally, she told him that he would need to get the ChexSystems matter straightened out before the bank could proceed with his loan application. Willie Kelly then indicated to Ms. Hunt that he would get something in writing from the Oklahoma bank that would straighten out the situation.

---

**10.** By this time, plaintiff had finished his meeting with Ms. Turner and had joined Willie Kelly at Ms. Hunt's desk.

**11.** Ms. Hunt estimated that approximately twenty minutes had passed since she left her desk to copy Willie Kelly's license.

The Kelly brothers then left the bank without incident and without any knowledge· that the bank employees harbored suspicions about them.

In the meantime, armed only with the knowledge that Willie Kelly, an African American, had presented an unusual driver's license and had bounced one check, Mr. Hall proceeded to run a criminal background check on Willie Kelly.[12] The check revealed two outstanding bench warrants that Mr. Hall assumed were nonextraditable. Still unsatisfied, Mr. Hall wanted to do some "further investigation" because one of the warrants was followed by an asterisk-something that Mr. Hall had never seen before. Moreover, Mr. Hall did not know the significance of the asterisk.

Mr. Hall telephoned Ms. Hunt and informed her about the warrants, the asterisk and the fact that he did not know what the asterisk meant.[13] He also asked her to send him copies of any identification information and copies of the checks as, by this time, Mr. Hall had been advised that plaintiff had presented a similar check. Mr. Hall also contacted Mercantile Bank's fraud department to ascertain whether it issued an instrument entitled "Official Check." A representative of Mercantile indicated that they did indeed have instruments called Official Checks but that they would have to see the particular check to determine whether it was one of their checks.

At some point after the Kelly brothers left the bank, Mr. Grabbe completed a Branch Activity Report and accompanying memorandum-forms that security guards regularly complete about events that happen at the branch while they are on duty. These forms, as completed by Mr. Grabbe, reflected the details of the "possible fraud" involving the Kelly brothers. The forms also indicated that Mr. Grabbe called 911 regarding the two brothers and that a subsequent background check of Willie Kelly had uncovered two outstanding warrants. Finally, the forms indicated that the brothers left the bank before the police responded to the call and, indeed, that the police did not respond to the call. Although Mr. Grabbe learned before he left for the day that Willie Kelly's warrants were nonextraditable, he failed to amend the Branch Activity Report and accompanying memorandum to reflect that fact.

Before leaving for the day, Mr. Grabbe also called the bank's guard service manager, Jesse Harrison. Mr. Grabbe advised Mr. Harrison of the events that had taken place that day with respect to the Kelly brothers, including the fact that he had called the police but that the police had not responded to the call. Mr. Grabbe explained Willie Kelly's driver's license to Mr. Harrison, particularly the fact that it was issued in Oklahoma but bore a Kansas City, Missouri address. Mr. Harrison asked for the address appearing on the license as well as any other addresses offered by the Kelly brothers on their applications. Armed with three addresses, including the address on Willie Kelly's license (which happened to be the same street address as the street address on plaintiff's license), Mr. Harrison set out in his car to ascertain whether the properties in fact existed. Mr. Harrison testified that driving by property is not something that he regularly does as part of his job. When asked whether he had ever driven by property as part of his employment with the bank, Mr. Harrison replied, "very infrequently." No evidence was presented

---

12. At some later time, Mr. Hall conducted a criminal background check on plaintiff. He did not uncover anything about plaintiff.

13. Of course, given the fact that the warrants were nonextraditable, it is highly unlikely that the asterisk could have signified anything particularly serious.

at trial, however, of any other instance when Mr. Harrision drove by someone's property to verify an address.

Although he was able to locate two of the addresses, Mr. Harrison testified that he could not find the address listed on Willie Kelly's license. Specifically, Mr. Harrison testified that he could not find a house number to match the one given to him by Mr. Grabbe (and taken from Willie Kelly's license). Mr. Harrison further testified that he was not surprised that he could not find the house number because, based on what he had been told, he believed the license was fictitious. He reported back to the bank that the street address on Willie Kelly's license (and, thus, plaintiff's license) did not exist. Several months later, Mr. Harrison contacted the state of Oklahoma and learned that Oklahoma does permit individuals to obtain a driver's license bearing a street address in another state.[14] Mr. Harrison also learned later that the street address on Willie Kelly's license was in fact a "good address."

*February 18, 1999*

In the early morning hours of February 18, 1999, Mike Murchison, the security guard on duty for that day, reported to work and reviewed the branch activity report and accompanying memorandum from the previous day. He discovered from reading these documents that two individuals had come in to open an account; that there were questions about the checks presented by the individuals; that there were outstanding warrants with respect to one of the individuals; and that Mr. Grabbe had called 911 but the police did not arrive before the two individuals left the bank.

Later that morning, Mr. Hall faxed to Mercantile a copy of the checks presented by the Kellys. A short while later, Karen Maslanka, a staff investigator at Mercantile, called Mr. Hall about the checks. While the evidence is inconsistent on this point, the court finds that Mr. Hall received some signal from Ms. Maslanka that something was wrong with the checks-whether it be that the customer did not remember visiting Bank Midwest, that the customer reported that the checks were lost or stolen, or that the customer simply did not have the checks in his possession. Shortly thereafter, Mr. Murchison heard from someone at Bank Midwest that one or both of the checks presented by the Kelly brothers had been reported as stolen.

In the meantime, plaintiff called Ms. Turner to inquire about the status of his loan. Ms. Turner advised plaintiff that the bank would be unable to process plaintiff's loan because he had given them some information that made them "feel uncomfortable," including the fact that plaintiff's driver's license number was different from his social security number. Plaintiff now had the opportunity to explain to Ms. Turner that he purposefully used a different number on his driver's license for security and privacy reasons. Ms. Turner also told plaintiff that certain property identified by plaintiff on his application did not exist.

---

**14.** The court finds it odd that none of the bank personnel, including the three security people who became involved on February 17 (Mr. Grabbe, Mr. Hall and Mr. Harrison) thought to contact the Oklahoma licensing authorities until after the fact. They resorted to various investigative aids but failed to pursue the one that lay at the heart of the matter, checking out Willie Kelly's unusual license. The court draws the inference from the entirety of the evidence in this case that race played a part in the bank's conduct, either in terms of how the information was relayed by the personnel on scene at the bank or how the information was processed by the people asked to act upon it. A predisposition toward the conclusion that the Kellys were in engaged in wrongdoing permeated the bank's handling of this matter through most of this entire incident.

Of course, Ms. Turner was only assuming that the property did not exist based on Mr. Harrison's report-no one had ever asked plaintiff about the property. Ms. Turner also mentioned some of the circumstances surrounding Willie Kelly's application, including the report from ChexSystems. Plaintiff reminded Ms. Turner that he and Willie Kelly were "two separate people," and then asked to speak to the branch manager.

Plaintiff testified that his conversation with Bart Nill, branch manager, was "along the same lines as the conversation with Ms. Turner." In essence, Mr. Nill reiterated Ms. Turner's concerns about plaintiff's driver's license number and that certain property identified by plaintiff did not exist. Plaintiff advised Mr. Nill that he would bring to the bank additional documentation to verify the information in his loan application, including his social security card and real property appraisals. According to Mr. Nill, his "comfort level" increased during his conversation with plaintiff and he determined that so long as plaintiff's check was good, he would approve plaintiff's loan application. Mr. Nill, however, did not communicate his conclusion to plaintiff. Moreover, plaintiff testified that at the end of his phone conversation with Mr. Nill, he was "unhappy" and held the belief that he had to bring in additional documentation to support his loan application. In Mr. Nill's mind, however, plaintiff did not need to bring in any additional documentation; rather, Mr. Nill knew that he would approve the loan as soon as he learned that the check presented by plaintiff was valid. Suffice it to say, there was some level of miscommunication between Mr. Nill and plaintiff during this phone conversation. In any event, plaintiff gathered the additional documentation that he had discussed with Mr. Nill and planned to return to the bank later that day. Before leaving for lunch, Mr. Nill contacted Mercantile bank and learned that the check presented by plaintiff was good.[15] Thus, before leaving for lunch, Mr. Nill knew that he was going to make the loan to the plaintiff.

Around noon on February 18, 1999, Mr. Murchison heard the bank's receptionist, Roberta Laird, call out his name. Ms. Laird advised Mr. Murchison that the "guys that were there the day before were back."[16] Upon hearing this, Mr. Murchison directed Sharla Cain, a teller, to call the police. Mr. Murchison also tried without success to find Ms. Hunt. According to a report written by Mr. Murchison about the day's events, Mr. Murchison "found out later that [Ms. Hunt] had ran and was hiding behind the teller line."

At trial, Mr. Murchison testified that the statement in his report about Ms. Hunt "running and hiding" was "probably a misstatement," that it was just a "descriptive phrase" used by him, and that he did not have any real basis for putting that phrase in the report. The court concludes that Mr. Murchison's testimony at trial was not credible and that the description of Ms. Hunt's behavior in Mr. Murchison's report more accurately reflects how Ms. Hunt was in fact behaving. Moreover, Ms. Hunt's behavior is significant because it strongly suggests that Ms. Hunt perceived the Kellys as dangerous criminals-a perception that lacked any rational basis and thus, as the court has concluded, was based solely on the Kellys' race.

---

**15.** As explained below, Mr. Hall learned that the checks were good around the same time that Mr. Nill learned this information. By the time Mr. Hall received this information and relayed the information to Ms. Hunt, however, the police had already been called to the bank.

**16.** Apparently, the Kellys had been spotted in the bank parking lot—they had not yet entered the bank.

As the Kelly brothers entered the lobby of the bank, they both noticed that all the bank employees were watching them and that the receptionist was acting differently than she was the day before. Plaintiff testified, for example, that the receptionist was acting "panicky or nervous, jittery." This evidence suggests that the bank employees, perhaps taking their cue from Ms. Hunt, perceived that the Kellys were dangerous or were a threat of some kind. It further suggests that the bank employees viewed the Kelly brothers as criminals coming to do harm at the bank instead of businessmen coming to transact business.

Plaintiff asked the receptionist if he could speak with Cathy Turner or Bart Nill. The receptionist advised plaintiff that neither Ms. Turner nor Mr. Nill were in the bank at that time. Plaintiff then left his business card with the receptionist with a message to have either Ms. Turner or Mr. Nill call him. In the meantime, Willie Kelly, who had returned to the bank with documentation from the Oklahoma bank indicating that the ChexSystems situation was straightened out, learned from Ms. Hunt that she still could not process his loan and that she needed to speak with her supervisor about his loan application. The Kelly brothers then exited the bank.

In the meantime, two officers had been dispatched to the bank and the officers made contact with the Kellys in the bank parking lot. Specifically, as plaintiff was attempting to drive his car out of the parking stall, the front and rear ends of his car were blocked by a patrol car. The officers asked the Kelly brothers for identification and questioned the brothers about why they were at the bank. The Kelly brothers, in turn, questioned the officers about why the officers had been called to the bank.

Just before the police arrived at the bank, Bill Hall received another phone call from Mercantile bank. This time, the Mercantile representative advised Mr. Hall that the checks presented by the Kellys were good checks. Again, the evidence on this point is inconsistent, but suffice it to say that Mr. Hall received a substantially different message from Mercantile during this phone call than he had received earlier that day. Upon learning this new information, Mr. Hall called Ms. Hunt and advised her that the checks were good. The police made contact with the Kelly brothers as Ms. Hunt was on the phone with Mr. Hall. In fact, in the middle of her phone conversation with Mr. Hall, Ms. Hunt "heard some commotion" and heard "the tellers" say "the police are here; we got them!" This exclamation from the tellers further supports the court's conclusion that the bank had concluded that the Kelly brothers were criminals.

At that time, one of the officers came into the bank to find out more about the situation. After talking to Ms. Hunt, the officer learned that the checks were good. When the officer returned from inside the bank, he essentially told the Kelly brothers that everything was fine. Plaintiff then went back into the bank in an effort to ascertain why the police had been called. Once inside the bank, plaintiff asked Ms. Hunt why the police had been called. Ms. Hunt responded that she did not know. While plaintiff was still in the bank, Bart Nill's secretary paged Mr. Nill. When Mr. Nill responded to the page, his secretary advised him that the police and the Kelly brothers were at the bank. Mr. Nill instructed his secretary to let the Kellys know that everything was all lined up for the loans and that he wanted to set up a closing time for the next day to get the loans closed. It is unclear whether plaintiff ever received this message from Mr. Nill's secretary. In any event, having received no explanation from anyone about why the police were called, the Kelly

brothers left the bank.[17] A few minutes later, the officers left the bank.

Later that afternoon, Mr. Nill called plaintiff. Plaintiff told Mr. Nill that he wanted to talk to him about why the police were called. Mr. Nill and plaintiff agreed to meet at 1:00 p.m. the next day. In Mr. Nill's mind, the primary purpose of the meeting was to close plaintiff's loan. It is unclear from the evidence whether plaintiff knew this or whether he thought the bank had not yet decided whether to approve his loan.

*February 19, 1999*

On February 19, 1999, plaintiff returned to the bank to meet with Mr. Nill. His brother did not join him on this visit. During plaintiff's meeting with Mr. Nill, plaintiff asked for an explanation as to why the police were called. Mr. Nill responded that the bank had "definitely overreacted" and Mr. Nill apologized to plaintiff on behalf of the bank. Plaintiff also asked Mr. Nill whether he could ask him a series of questions that he had written down. When Mr. Nill agreed, plaintiff asked him whether it was the bank's common practice to drive by property listed on a loan application, to contact an issuing bank with respect to a cashier's check to ascertain whether the check was stolen, and to do unauthorized background checks to ascertain whether a person has outstanding warrants. To each of these questions, Mr. Nill responded that it was not the bank's practice to do such things. Finally, plaintiff asked Mr. Nill whether "this would have happened" if plaintiff was white. Mr. Nill responded, "probably not."

While Mr. Nill remembers plaintiff raising the subject of race during their meeting, he denies making any statement to plaintiff suggesting that plaintiff would not have been treated the way he was treated but for plaintiff's race. The court, however, believes that Mr. Nill did say something to plaintiff that, in essence, acknowledged to plaintiff that steps had been taken in connection with plaintiff's efforts to obtain a loan that were not taken in the ordinary course of the bank's business, that many of those steps simply did not make sense and that, in the absence of any other explanation, the likely explanation for those steps was plaintiff's race. Stated another way, the court believes that Mr. Nill (a person in a position to know about the bank's usual procedures) recognized on February 19, 1999 what the court recognizes after a full trial on the merits-that the events that took place at the bank in connection with plaintiff's and Willie Kelly's efforts to obtain loans were so extraordinary that race must have played a part in those events (or, at the very least, in the initial steps taken by Ms. Hunt and Mr. Grabbe that set the wheels in motion for the events that followed).

In any event, Mr. Nill advised plaintiff that his loan paperwork had been processed and that his loan had been approved. Mr. Nill then introduced plaintiff to Jon Montgomery, one of the bank's customer service representatives, who assisted plaintiff with the closing of plaintiff's loan.[18] After completing the closing documents, plaintiff obtained the loan proceeds and left the bank.

## II. Conclusions of Law

■ Plaintiff claims that the bank unlawfully interfered with his right to make

---

**17.** Thirty to forty minutes passed from the time the police arrived to the time the Kelly brothers left the bank.

**18.** Both Mr. Nill and Mr. Montgomery indicated to plaintiff that if Willie Kelly was still interested in obtaining a loan from the bank, the bank would make that loan available. Willie Kelly was apparently not interested in pursuing his transaction with the bank.

and enforce a contract in violation of 42 U.S.C. § 1981. Section 1981 ensures, among other rights, that persons of all races shall have equal rights to make and enforce contracts. *See Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir.2000). To prevail on a claim of discrimination under section 1981, plaintiff must show that he is a member of a protected class; that defendant had the intent to discriminate on the basis of race; and that the discrimination interfered with a protected activity as defined in section 1981. *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–03 (10th Cir. 2001). As it is undisputed that plaintiff is African–American, the proper focus of this case is "whether the defendant had the intent to discriminate on the basis of race, and whether that discrimination interfered with the making or enforcing of a contract." *See id.* at 1106–07 (citing *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir.1997)). As set forth in more detail below, the court concludes that defendant had the intent to discriminate on the basis of race and that discrimination interfered with plaintiff's right to make a contract.

*Intentional Racial Discrimination*

■■■ To prevail on a claim of race discrimination, plaintiff bears the ultimate burden of proving by a preponderance of the evidence that his race was a motivating factor in the defendant's actions. *See Elmore v. Capstan, Inc.*, 58 F.3d 525, 529 (10th Cir.1995) (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Where, as here, a plaintiff attempts to prove intentional discrimination by indirect evidence, the court employs the shifting burden of proof scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and the court, as the fact finder, considers all the conflicting inferences that the circumstantial evidence may present.

*See Hampton*, 247 F.3d at 1107. Although the *McDonnell Douglas* framework provides a "basic 'order of presentation of proof' so that the controversy can be increasingly brought into focus," it was never intended to "provide a mechanistic approach to what ultimately becomes a straightforward trial about motive." *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316–17 (10th Cir.1992) (citations and quotations omitted). At this stage in the proceedings, after a full trial on the merits, the sequential analytical model adopted from *McDonnell Douglas* drops out of consideration and the court is left with the single overarching issue of whether plaintiff has adduced sufficient evidence to warrant the determination that defendant's actions were motivated by his race. *See Hampton*, 247 F.3d at 1107. In the final analysis, the court, as the finder of fact, is required to weigh all the evidence and to assess the credibility of the witnesses in order to determine whether the plaintiff was the victim of intentional discrimination based upon his race. *See Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 744 (10th Cir. 1991); *accord Hampton*, 247 F.3d at 1107.

■■■ In light of the facts as the court has found them, plaintiff has persuaded the court that defendant's actions were motivated by plaintiff's race. That is not to say that the court believes that the bank's employees were motivated by racial animus or hostility or that the bank employees maliciously set about to treat plaintiff badly because of his race. But "racial animus" and "intent to discriminate" are not synonymous. *See, e.g., Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472–73 (11th Cir.1999). In other words, ill will, enmity, or hostility are not prerequisites of intentional discrimination. *Id.* at 473 n. 7. It is clear that a defendant who acts with no racial animus but acts, whether consciously or unconsciously, on the ba-

sis of racial stereotypes or preconceived notions about African Americans can be held liable for intentional discrimination within the meaning of section 1981. *See id.* at 472–73 (defendant who acted without racial animus but consciously and intentionally made job assignments based on racial stereotypes is liable for intentional discrimination); *Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 58–61 (1st Cir.1999) (discussing intentional discrimination stemming from stereotypes and other types of cognitive biases), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000).

In *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987), for example, the Supreme Court clearly held that liability for intentional discrimination under section 1981 requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus. There, union members sued their union for intentionally failing to assert race discrimination claims against the employer. In its analysis, the Court explained that although "there was no suggestion that the [defendant] held any racial animus against or denigrated blacks generally," *id.* at 668, 107 S.Ct. 2617, the defendant still could be held liable for racial discrimination under section 1981 regardless of whether the union leaders were favorably disposed toward minorities. *Id.* at 669, 107 S.Ct. 2617.

■ Moreover, in the sex discrimination context, the Supreme Court has recognized on at least two occasions that decisions resulting from "stereotyped" impressions, myths, and purely habitual assumptions about the characteristics or abilities of women run afoul of Title VII. *See EEOC v. Joe's Stone Crab, Inc.,* 220 F.3d 1263, 1284 & n. 20 (11th Cir.2000) (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *City of Los Angeles, Dep't of Water & Power v. Manhart,* 435 U.S. 702, 708 & n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)).[19]

In *Manhart,* the Court acknowledged that "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." 435 U.S. at 708 n. 13, 98 S.Ct. 1370. In *Price Waterhouse,* the district court found that the employer, an accounting firm, had discriminated against Ann Hopkins by permitting stereotypical attitudes about women (Hopkins had been found "too acerbic" in her tone for a woman) to play a role in its decision to deny her partnership in the firm. *See Hopkins v. Price Waterhouse,* 618 F.Supp. 1109, 1118–19 (D.D.C.1985). On appeal, the employer contended that it could not be liable for disparate treatment because "Hopkins did not prove 'intentional' discrimination on the part of the [decision-making] Board, but only 'unconscious' sexual stereotyping by unidentified partners who participated in the selection process." *Hopkins v. Price Waterhouse,* 825 F.2d 458, 468

**19.** In the race discrimination context, the Tenth Circuit applies the same standards and burdens to a Title VII claim as it applies to a section 1981 claim. *See, e.g., Aramburu v. Boeing Co.,* 112 F.3d 1398, 1403 n. 3 (10th Cir.1997). Thus, the principles regarding intentional discrimination set forth in the *Price Waterhouse* and *Manhart* decisions would apply equally to a section 1981 action. Moreover, the court can discern no reason why the Supreme Court's statements regarding sex stereotypes would not apply with equal force to racial stereotyping. *See, e.g., Thomas v. Eastman Kodak Co.,* 183 F.3d 38, 58–61 (1st Cir.1999) (applying principles regarding sex stereotyping, including a discussion of the Supreme Court's *Price Waterhouse* decision, to racial discrimination context), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000).

(D.C.Cir.1987). This argument was squarely rejected by the court of appeals:

> In keeping with [Title VII's remedial] purpose, the Supreme Court has never applied the concept of intent so as to excuse an artificial, genderbased employment barrier simply because the employer involved did not harbor the requisite degree of ill-will towards the person in question. As the evidentiary framework established in *McDonnell Douglas* makes clear, the requirement [ ] of discriminatory motive in disparate treatment cases does not function as a "state of mind" element, but as a method of ensuring that only those arbitrary or artificial employment barriers that are related to an employee or applicant's race, sex, religion, or national origin are eliminated.

*Id.* at 468–69 (footnotes omitted). This reasoning was affirmed on appeal by a plurality opinion of the Supreme Court. *See Price Waterhouse,* 490 U.S. at 250–52, 109 S.Ct. 1775 (plurality opinion); *id.* at 259, 109 S.Ct. 1775 (White, J., concurring in the judgment); *id.* at 261, 272, 277–78, 109 S.Ct. 1775 (O'Connor, J., concurring in the judgment). Notably, the *Price Waterhouse* plurality explained that "[i]n the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender," and therefore has committed intentional discrimination under Title VII. *Id.* at 249, 109 S.Ct. 1775.

The law is clear, then, that intentional discrimination includes those acts or decisions based on unthinking racial stereotypes or bias. *See Pitre v. Western Elec. Co.,* 843 F.2d 1262, 1273 (10th Cir.1988) ("One familiar aspect of sex discrimination is the practice, whether conscious or unconscious, of subjecting women to higher standards of evaluation than are applied to their male counterparts.") (quoting *Swee-*

*ney v. Board of Trustees of Keene State College,* 604 F.2d 106, 114 (1st Cir.1979)).

Finally, as the Supreme Court held in *Reeves v. Sanderson Plumbing Products, Inc.,* and the Circuit reiterated in *Hampton,*

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

*Hampton,* 247 F.3d at 1108 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). As noted above, the court found certain key aspects of both Ms. Hunt's and Mr. Grabbe's testimony not to be credible and, at times, believed that Ms. Hunt was less than truthful.

In brief, and as set forth in more detail in the court's findings of fact, the court has found that defendant's actions were based on racial stereotyping. Plaintiff, thus, has proven intentional discrimination for purposes of section 1981.

*Interference with a Contract*

 Having proven intentional racial discrimination, plaintiff must persuade the court that discrimination interfered with the making of a contract. *See Hampton,* 247 F.3d at 1107. As it did at the summary judgment stage, defendant again urges that plaintiff's claim fails under section 1981 because plaintiff ultimately obtained the loan. In other words, defendant argues that plaintiff's claim fails because he did not suffer the actual loss of a contract interest. The court rejected this argument at the summary judgment stage and, for the same reasons which the court will not repeat, the court re-

jects the argument here. *See Kelly v. Bank Midwest, N.A.*, 161 F.Supp.2d 1248, 1255–58 (D.Kan.2001). In brief, the court held, based on guidance from the Tenth Circuit in *Hampton*, that a section 1981 claim is actionable where different conditions are placed upon an African American plaintiff's right to enter contractual relations, even when that plaintiff eventually enters the contract. In so holding, the court relied on two decisions cited with approval by the Circuit in *Hampton–Bobbitt v. Rage Inc.*, 19 F.Supp.2d 512, 518–20 (W.D.N.C.1998) and *Washington v. Duty Free Shoppers, Ltd.*, 710 F.Supp. 1288, 1289–90 (N.D.Cal.1988). The court also looked to the district court's decision in *Joseph v. New York Yankees Partnership*, No. 00 Civ. 2275(SHS), 2000 WL 1559019 (S.D.N.Y. Oct.19, 2000), where the court held:

> [I]mposing an additional condition upon minority customers that is not imposed upon non-minorities states a section 1981 claim for discrimination concerning the making and enforcing of contracts. Where additional conditions are placed on minorities entering the contractual relationship, those minorities have been denied the right to contract on the same terms and conditions as is enjoyed by white citizens.

*Id.* at *4 (quoting 42 U.S.C. § 1981(b)).

[11] The court is persuaded that plaintiff was subjected to different conditions in the course of his transaction with the bank that he would not have been subjected to but for his race. In the simplest of terms, his transaction was subjected to heightened scrutiny and he was subjected to heightened suspicion after his brother presented an unusual driver's license to the bank-heightened scrutiny and suspicion that was most apparent in the fact that the police were called to the bank based solely on the presentation of an unusual license and the fact that Willie Kelly had bounced a check in Oklahoma. In turn, the heightened scrutiny and suspicion led to a sequence of steps that, as Bart Nill admitted, were not steps that were taken in the ordinary course of business. Particularly with regard to having to endure the police encounter, these were "conditions" that citizens do not ordinarily have to tolerate in their dealings with financial institutions. Ultimately, the court is convinced that plaintiff was treated less favorably in the making of his contract based on his race. Such is the essence of a section 1981 claim.

Defendant also argues that plaintiff's section 1981 claim fails because most of the bank's conduct did not relate to the making of a contract; rather, it related to the bank's security program. The Circuit rejected a similar argument in *Hampton*. There, the defendant argued, the dissent agreed, and the testimony at trial supported the idea that the security officer who stopped and searched the plaintiff was totally removed from the contractual relationship-that he stopped the plaintiff as she was moving toward the store's exit and that he did not believe that she was planning to obtain the benefit of her contract with the defendant by redeeming a coupon for a perfume sample. *See Hampton*, 247 F.3d at 1105–07. In other words, as noted by the dissent, the timing of the officer's conduct was "purely fortuitous." *See id.* at 1106 n. 3. The majority rejected this argument, noting that section 1981 "protects enjoyment of the benefits of a contract from *any* impairment, so long as the impairment arises from intentional discrimination." *Id.* at 1106 (emphasis in original) (citing 42 U.S.C. § 1981(a)) ("All persons … shall have the same right … to make and enforce contracts … as is enjoyed by white citizens."). Thus, the mere fact that Mr. Grabbe's conduct, for example, did not specifically relate to plaintiff's efforts to obtain a contract is insufficient to defeat this section 1981 ac-

tion when that conduct certainly impaired plaintiff's right to make a contract and was based on plaintiff's race. In any event, Mr. Grabbe knew much more about plaintiff's and Willie Kelly's circumstances, including the transactions they were trying to complete, than the security guard in *Hampton* knew about that plaintiff's contractual relationship with the defendant. In other words, Mr. Grabbe's conduct is inextricably intertwined with plaintiff's efforts to obtain a loan from the bank.

*Remedy*

Having concluded that defendant intentionally discriminated against plaintiff on the basis of race and that discrimination interfered with the making of plaintiff's contract, the court turns to address the appropriate remedy for the violation. Section 1981 makes available to a successful plaintiff both compensatory and punitive damages. *See Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1115 (10th Cir.2001) (citing *Karnes v. SCI Colo. Funeral Servs., Inc.*, 162 F.3d 1077, 1080 (10th Cir.1998) (noting availability of compensatory and punitive damages under § 1981)). As plaintiff has not made a claim for punitive damages, the court need only analyze plaintiff's claim for compensatory damages. Moreover, as it is undisputed that plaintiff suffered no economic damage as a result of the bank's conduct, the court's analysis of plaintiff's claim for compensatory damages is limited to the evidence regarding plaintiff's emotional suffering. *See id.*

■ The court easily concludes that the evidence supports an award for such anguish and distress. Plaintiff testified that his experience at the bank caused him a great deal of embarrassment and humiliation, particularly because plaintiff, an individual who has made considerable efforts to "make it" as a business professional, was treated like a criminal in a place of business where he had gone to transact

business. He testified that the situation at the bank "overwhelmed" him, left him feeling "defeated," and caused him to distrust others and question himself.

Evidence was presented at trial concerning other events in plaintiff's life during the relevant time period that may have caused plaintiff to suffer emotional distress (*i.e.*, encounters with the police that were unrelated to plaintiff's experience at Bank Midwest, unrelated to the business world, and appear to have been completely unwarranted). Despite this evidence, the court is convinced that the situation at the bank had a greater impact upon plaintiff than plaintiff's other experiences because it happened in a business environment. Plaintiff credibly testified, in essence, that he had come to grips with racial profiling by law enforcement and was encouraged by apparent efforts to curtail it. Being similarly "profiled" in a purely business context where his dress, behavior and intentions were all in keeping with the teachings of his family and in accordance with society's norms, however, made a profound and jarring impact.

In addition, plaintiff's testimony was corroborated by his parents and his spouse. Plaintiff's mother, for example, testified that prior to his experience at Bank Midwest, plaintiff was very friendly and outgoing and very confident in himself. According to plaintiff's mother, plaintiff's experience at the bank "made an impact, a negative impact, on his personality" and that he was "devastated." She further testified that plaintiff was more pessimistic, less self-confident, and tended to question his ability to interact in the business world. Similarly, plaintiff's father testified that his son had been very outgoing and very "jubilant" prior to his experience at Bank Midwest. By contrast, according to plaintiff's father, plaintiff was "withdrawn" and pessimistic after the ex-

perience at the bank. Plaintiff's father further testified that plaintiff "questioned himself a lot more, even today" in terms of transacting business and was "not as sure of himself" in the corporate world as he once was. The testimony of plaintiff's wife reflected similar concerns-that plaintiff was less confident, more reserved and more hesitant in both business and personal respects.

The court, however, also finds that the emotional distress suffered by plaintiff in connection with his experience at Bank Midwest should have been alleviated to some degree by Mr. Nill's candid comments to plaintiff on February 19, 1999. Faced with similar circumstances, many managers simply would have denied any wrongdoing on the part of the company or, at the very least, would have been reluctant to answer plaintiff's questions openly and honestly. By contrast, Mr. Nill offered plaintiff a sincere apology on behalf of the bank, acknowledged that the bank's conduct did not conform with the bank's regular business practices and, perhaps most significantly, listened to plaintiff's specific concerns. Thus, the court also considers Mr. Nill's conduct during his February 19 meeting with plaintiff in assessing the amount of damages sustained by plaintiff and concludes that Mr. Nill's conduct with respect to plaintiff mitigates somewhat plaintiff's claim for emotional distress damages.

In short, after reviewing the totality of the circumstances surrounding plaintiff's claim for emotional distress damages, the court concludes that an award of forty thousand dollars ($40,000.00) is appropriate to compensate plaintiff for his emotional distress. *See Wulf v. City of Wichita,* 883 F.2d 842, 875 (10th Cir.1989) (remanding § 1983 action for reconsideration of compensatory damages award and stating that award should be no greater than $50,000 where plaintiff testified only that

his job loss was "very stressful," that he was angry, depressed, scared and frustrated and had experienced financial difficulties); *see also Hampton,* 247 F.3d at 1114–15 (affirming compensatory damages award of $56,000 in retail context where plaintiff, accused of shoplifting and stopped by a security officer, testified that she felt humiliated and disgraced by the accusations and "that her emotional damages were immediately evident, as she was visibly upset after the incident, as well as lasting, as she is now unable to shop with her children for fear of future ridicule and humiliation").

**IT IS THEREFORE ORDERED BY THE COURT THAT** judgment be entered in favor of plaintiff Dederick Kelly on his claim of race discrimination in the amount of $40,000.00 in compensatory damages.

**IT IS SO ORDERED.**